ORIGINAL

FILED IN CLERK'S OFFICE
U.S.D.C. Atla.

FEB 0 1 2005

LUTHER D. THOMAS, Clerk
By: _____ Deputy Clerk

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

|  |  |  |
|---|---|---|
| UNITED STATES COMMODITY FUTURES TRADING COMMISSION, | ) ) ) ) | |
| Plaintiff, | ) ) ) ) | **Complaint For Injunctive And Other Equitable Relief And Civil Monetary** |
| vs. | ) ) | **Penalties** |
| PAUL ATHA, CHRISTOPHER McDONALD, and MICHAEL WHALEN, | ) ) ) ) ) | **Civil Action No.:** **1:05-CV-0293** |
| Defendants. | ) ) ) | **JOF** |

Plaintiff, United States Commodity Futures Trading Commission

("Commission"), by its attorneys, alleges as follows·

**I. Summary**

1.     As more fully alleged below, Defendants Paul Atha ("Atha"),

Christopher McDonald ("McDonald"), and Michael Whalen ("Whalen") have

engaged in acts and practices that constitute violations of the Commodity

Exchange Act, as amended (the "Act"), 7 U.S.C §§ 1 et seq. (2002)[1].

---

[1] Most of the conduct alleged herein occurred prior to enactment of the Commodity Futures Modernization Act in December 2000  However, the provisions of the Act alleged in this Complaint did not change when the Act was amended  Therefore, for the convenience of the Court  the Commission is using the current citation to the Act.

FORMS RECEIVED
Consent To US Mag.
Pretrial Institutions
TRIe Via NFC

2    During the period beginning in January 2000 and ending in late 2000 or early 2001. (the "relevant period"), Defendants violated Sections 6(c), 6(d) and 9(a)(2) and 13(a) of the Act, 7 U S C. §§ 13b 13(a)(2) and 13c(a) (2002), by knowingly delivering, or causing to be delivered, for transmission through the mails or interstate commerce by telegraph, telephone, wireless, or other means of communication false or misleading or knowingly inaccurate reports concerning market information or conditions that affect or tend to affect the market price of natural gas, and by attempting to manipulate the market price of natural gas

3    Accordingly, pursuant to Section 6c of the Act, 7 U.S.C. §13a-1, the Commission brings this action to enjoin such acts and practices, and to compel compliance with the provisions of the Act   In addition. the Commission seeks civil monetary penalties and such other ancillary relief as the Court deems necessary or appropriate under the circumstances.

4.    Unless restrained and enjoined by this Court, there is a reasonable likelihood that Defendants will continue to engage in the acts and practices alleged in this Complaint or in similar acts and practices, as more fully described below.

## II.  Jurisdiction and Venue

5    This Court has jurisdiction over this action pursuant to Section 6c of the Act, 7 U S.C. § 13a-1, which authorizes the Commission to seek injunctive

2

relief against any person, or, to enforce compliance with the Act whenever it shall appear to the Commission that such person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of the Act or any rule, regulation or order thereunder.

6.     Venue properly lies with this Court pursuant to Section 6c(e) of the Act, 7 U S C § 13a-1(e), in that Defendants are found in, inhabit and transact business in this District, and/or the acts and practices in violation of the Act have occurred, are occurring, or are about to occur within this District.

### III.  The Parties

7.     Plaintiff Commission is an independent federal regulatory agency charged with the administration and enforcement of the Act, 7 U.S C. §§ 1 *et seq.*, and the regulations promulgated thereunder, 17 C F.R §§ 1.1 *et seq.*

8     Defendant Atha resides in Dunwoody, Georgia. At all times relevant, Atha was a natural gas trader at Atlanta-based Mirant America's Energy Marketing, L.P. ("Mirant"), a subsidiary of Mirant Corporation, or its predecessor in interest, Southern Company Energy Marketing, L.P., trading natural gas in the Western Region of the United States ("West Desk").

9     Defendant McDonald resides in Atlanta, Georgia. At all times relevant, McDonald was employed by Mirant. During the relevant period,

3

McDonald held the positions of Vice President and Chief Commercial Officer, and Director of West Desk. Both positions required McDonald to work with and supervise the Atlanta-based natural gas marketing, trading and scheduling staff. While Director of West Desk, McDonald supervised other traders, including Atha, and also traded and marketed a variety of instruments, including contracts for fixed price and index-based over-the-counter natural gas.

10      Defendant Whalen currently resides in Houston, Texas. From at least mid-1999 through approximately May 2000, Whalen was employed by Mirant in Atlanta, Georgia as a natural gas trader trading on the West Desk. While Whalen was employed by Mirant, McDonald was Whalen's supervisor    From approximately May 2000 through approximately August 2003, Whalen was employed in Houston, Texas as the Director of Financial Trading in the Energy Commodities Business Unit of Cinergy Corporation ("Cinergy"). During his employment with Cinergy, Whalen traded natural gas, including physical and financial products. Whalen's violations of the Act described herein occurred while he was a new employee of Cinergy, and he committed all of the violations with his former colleagues and friends at Mirant

4

## IV. Facts

### A.    The Natural Gas Market and Natural Gas Price Indexes

11    During the relevant period, natural gas was a commodity that was typically transported in interstate commerce through a network of pipelines across the United States

12    During the relevant period, Mirant and Cinergy sought to buy and sell natural gas for profit.  To that end, their traders entered into transactions calling for the actual physical delivery of natural gas ("physical trades").

13.    Physical trades were typically priced with either a fixed price set at the time of the transaction or with reference to an index to be set at a later date.

14    During the relevant period, natural gas traders and companies reported natural gas market information to companies that calculated natural gas price indexes ("indexes").

15.    The reported market information typically included price and volume information for natural gas transactions entered into for delivery at a specific location or hub

16.    During the relevant period, the price indexes were calculated using the transaction information reported by market participants, including Defendants

5

17     During the relevant period, participants in the natural gas industry widely used price indexes for various purposes, including the pricing and settlement of index trades.  Moreover, natural gas traders referred to indexes for price discovery and for assessing price risks

18     The indexes widely used by the natural gas industry during the relevant period included Platts (a division of the McGraw-Hill Companies) which issued *Inside FERC Gas Market Report ("IFERC")*, a monthly index for various natural gas hubs, and *Gas Daily*, a monthly and daily index for various natural gas hubs. *Natural Gas Intelligence* ("*NGI*"), issued by Intelligence Press, Inc., was another widely used daily, weekly, and/or monthly natural gas index

19.    The price and volume information reported to those indexes was market information that affects or tends to affect the price of natural gas, a commodity in interstate commerce

## B.     McDonald and Atha Regularly Falsely Reported and Attempted to Manipulate the Price of Natural Gas

20     During the relevant period, *IFERC* sent a monthly request for various categories of transaction information to Atha by electronic mail via the Internet that included a spreadsheet seeking transaction information regarding Mirant's trades.

21     The request stated that only a company's fixed-price baseload deals negotiated during bidweek should be reported   A baseload deal is a trade requiring the delivery of a specific quantity of natural gas on each day of the following month. Bidweek refers to the last four to five trading days of each month.

22.     During the relevant period, Atha completed the spreadsheet each month and delivered it, or caused it to be delivered, back to *IFERC* by electronic mail via the Internet. He did so as many as four times during each bidweek – usually once each day with daily cumulative additions. On the last day of each bidweek, Atha also delivered, or caused to be delivered, the completed spreadsheet to *Gas Daily* and *NGI*.

23     Atha knew that *IFERC*, *Gas Daily*, and *NGI* used the type of information contained in the spreadsheet to calculate their indexes.

24     The price and volume information Atha reported on the spreadsheet was not from Mirant's fixed-price baseload deals negotiated during bidweek.

25     Atha fabricated the price and volume information he reported based upon, among other things, price and volume information he received at regular morning meetings from other West Desk traders and from McDonald.

26     McDonald contributed the greatest amount of price and volume information to Atha, and Atha regarded McDonald's volumes and weighted average prices as the "final product" to take away from the meetings.

27     The volumes and weighted average prices McDonald provided to Atha were not from his actual trades or from any Mirant baseload deals negotiated during bidweek.

28.     McDonald knew that providing these volumes and weighted average prices to Atha would result in Atha reporting them to the indexes.

29.     Atha knew that McDonald's prices and volume-weighted averages were not from Mirant fixed-price baseload deals negotiated during bidweek. Nonetheless, Atha reported them to the indexes

30.     Ultimately, based upon the information Atha received at the morning meetings and from McDonald, Atha determined the total volumes and weighted average prices he would report for each natural gas price index location.

31.     Armed with this information, Atha fabricated trades to report for each hub by making up prices, volumes, trade dates, and counterparties. When fabricating the trades, Atha ensured that the sum of the fabricated trades equaled the predetermined total volume and weighted average prices he wanted to report.

8

32     Before Atha delivered, or caused to be delivered, the spreadsheet with the fabricated trades to the indexes, McDonald reviewed the spreadsheet and directed any changes that he wanted made

33.    Atha and McDonald believed that their reports would carry greater weight with the indexes if they reported trades were executed with counterparties that were active in the market.

34     Given their belief, Atha and McDonald made up counterparties for their reports by identifying larger, more active, counterparties on the spreadsheet and by excluding the actual Mirant counterparties who were not large "players" in the market.

35     McDonald knew that the foregoing conduct, including the reporting of false counterparties, was wrongful   Indeed, in late 2000 or early 2001, he told the Senior Vice President and Chief Executive Officer ("CEO") of the Northeast Region, the Senior Vice President and CEO of the West Region, the Senior Vice President and CEO of the East Region, and the General Counsel's office that price reporting misconduct was occurring on the West Desk, including, among other things, the reporting of false counterparties to the indexes

36.    As a result of their scheme, Atha and McDonald knowingly delivered, or caused to be delivered, to *IFERC*, *Gas Daily*, and *NGI* reports concerning

9

hundreds of natural gas trades   Most, if not all, of the submitted reports contained false or misleading or knowingly inaccurate information in the form of a fabricated price, fabricated volume, fabricated counterparty, and/or fabricated delivery point

37.     The false or misleading or knowingly inaccurate reports Defendants delivered, or caused to be delivered, to *IFERC*, *Gas Daily*, and/or *NGI* was market information that affects or tends to affect the price of natural gas, a commodity in interstate commerce, and Defendants knowingly delivered, or caused to be delivered, those reports in an attempt to manipulate the price of natural gas, a commodity in interstate commerce.

38.     If the attempted manipulation of the price of natural gas had been successful, it could have affected the price of natural gas, a commodity in interstate commerce, and the price of natural gas futures and options contracts traded on the New York Mercantile Exchange ("NYMEX").

## C.     McDonald, Whalen and Atha Falsely Reported and Attempted to Manipulate the Price of Natural Gas in July/August 2000

39     On July 27, 2000, McDonald telephoned Whalen, a new Cinergy employee, at Whalen's office at Cinergy, and told Whalen that he (McDonald) wanted the August *IFERC* index price at the Permian delivery point to be low

40     In an attempt to manipulate the August *IFERC* Permian index price lower than it would have been had normal market forces alone been at work to

establish the index price. McDonald told Whalen that he (McDonald) would report trades for the Permian delivery point at false, misleading, or knowingly inaccurate prices and/or volumes.

41      In order to ensure that the reports would carry greater weight with *IFERC*, McDonald told Whalen that he (McDonald) would falsely identify Cinergy as the counterparty to the transactions.

42.      Unbeknownst to anyone at Cinergy, Whalen, whose assigned duties at Cinergy did not include any price reporting to the indexes, agreed to assist McDonald with his attempt to manipulate the price of natural gas by ensuring that the *IFERC* Permian index was lower than it would have been had normal market forces alone been at work to establish the index.  In furtherance of the agreement, Whalen agreed to report the same false or misleading, or knowingly inaccurate transactions as McDonald, and agreed to falsely identify Mirant as the counterparty so that *IFERC* would likely include the reported transactions in its index calculations

43      McDonald's July 27, 2000 telephone call to Whalen was recorded as part of Cinergy and Mirant's routine business practice.  Not only does the call reveal that Whalen and McDonald intended to manipulate the price of natural gas

at the Permian delivery point, it indicates that they also intended to manipulate the

price of natural gas at multiple delivery points

44    The recording of the July 27, 2000 telephone call details McDonald

and Whalen's attempted manipulation as follows·

**McDonald:** *Yeah   I'm calling about the market   You—I—I'd like a low Permian index   Do you need the same?*

**Whalen:**    *Yeah, oh, yeah, absolutely.*

**McDonald:** *I'm going to report a bunch of trades with Cinergy at –I mean I think the Perm index should be down around 370*

**Whalen:**    *Right.*

**McDonald:** *So I'm going to report a bunch of trades with Cinergy around there*

**Whalen:**    *Okay·  Well, I'll do the same.*

**McDonald:** *Okay·*

**Whalen:**    *And then end of the month, same, same issue, high Waha, low Perm, high Ship, low everything else*

**McDonald:** *Yep*

**Whalen:**    *Okay*

**McDonald:** *Figured as much*

*           *           *

**McDonald:** *Anyways, on this purse I'm only going to report like 100 million a day*

**Whalen:**     *Okay, I'll do, I'll do the same*

**McDonald:** *All right*

45.     The next day, July 28, 2000, Whalen telephoned McDonald in Atlanta to make sure that the false or misleading or knowingly inaccurate reports each agreed to report to *IFERC* would match and be more "believable." During that telephone call, they fabricated trades at various locations and agreed that each would identify the other as the counterparty. This conversation between Whalen and McDonald was recorded. The telephone recording of that conversation details the attempted manipulation, in part, as follows:

**Whalen:**     *Hey, do you want to fax me     exactly what you guys are going to write down so it's more believable?*

*         *         *

**Whalen:**     *I'll just write the exact opposite*

*         *         *

**Whalen:**     *What about     Ship?*

**McDonald:** *Hang on   What have you got?  Ship [Channel]*

**Whalen:**     *How about Ship [Channel]?  Let's show some high ship wood today*

**McDonald:** *All right   So how about some 92s*

**Whalen:** *Mm-hmm*

**McDonald:** *For – so three-a-day at 92, and about four-a-day at 93?*

**Whalen:** *Yeah, that's fine   And that's going on today's – see, with you guys, I'm going to send it in like as a blanket sheet, and I'll need to put like a bunch of other companies on there as well, right, to make it more believable?*

**McDonald:** *Right*

*  *  *

**McDonald:** *You know, I mean, I – I'm – I think Permian index should be down there   I mean we did a truckload of shit down there (inaudible)*
**Whalen:** *In the high 60s*

**McDonald:** *Yeah, exactly*

*  *  *

**Whalen:** *So the 28th we'll do [for Ship Channel] three-a-day at 92, four-a-day at 93, and then do you want to do any Waha?*

**McDonald:** *Waha, do you want to do like – I don't know   It might be fishy if we did it -- have too many (inaudible) –*

**Whalen:** *Okay*

**McDonald:** *Cinergy*

**Whalen:** *Okay   Okay   That's fine*

**McDonald:** *We can do one deal Waha when we just say from – why don't we say at 385 for two-a-day  *** For yesterday*

**Whalen:**    *Okay, for the 27th   Okay, and then, can – do you have that sheet, or can [you connect me with Atha]       give me the contact of who I need to shoot this to, and so I can call them to get the format?*

**McDonald:** *Yeah  I'll have [Atha] e-mail you the spreadsheet, and it's Kelly Doolan[ ]*

46.    Later in the day on July 28, 2000, Whalen called Atha in Atlanta to finalize the list of fabricated trades that each would falsely report to *IFERC* as trades having been executed between them, and to again ensure that the prices and volumes they were going to report would be "believable" to *IFERC*.

47    This conversation between Whalen and Atha was recorded.  The telephone recording of that conversation details the attempted manipulation, in part, as follows:

**Whalen:**    *Hey, wanted to make sure that we concur here—*

**Atha:**    *Uh-huh.*

**Whalen:**    *--since we're doing so much wood  Do we go over the prices?*

*       * \*     \*     \*

**Whalen:**    *Just why don't you take it off -- do you have anything in Blanco?*

**Atha:**    *Blanco, no*

**Whalen:**    *I got you, Blanco, five July 26th at 357  Frankly I don't care where it settles, so you can tell me*

15

**Atha:**  *I'll put Cinergy in there   I had one at 357 half a day I'll put —I had APS in there, I'll just change that to Cinergy.*

**Whalen:**  *Okay*

                        *        *        *

**Atha:**  *So 50 on the  -- 50 at July 26 at 370*

**Whalen:**  *Right*

**Atha:**  *Then another 50 on July 26th at 370*
                        *        *        *

**Whalen:**  *Okay   Now, have you guys – do you guys –have you guys dropped in frequent  - is it common for you guys to drop in a 50 a day on the same day at the same price with one counter party or is this a first?*

**Atha:**  *No   That's why we're usually 25 has kind of been our –unless it was a real trade 25 has kind of been our max bullshit number*

**Whalen:**  *Right*

**Atha:**  *Unless we can get somebody else*

**Whalen:**  *Don't we make it a little bit more believable and break up the two 50 lots?*

**Atha:**  *Well, if we both have it, we weren't that concerned   But if we*

**Whalen:**  *This is the first time I'm reporting, though   I called and talked to [the reporter from IFERC] and had a really good conversation, but I don't want him to suspect   If we both      I*

*guess if we both have it he's got no reason to call and call bullshit, right?*

**Atha:**     *Right   No   I wouldn't think so   He didn't know that there is no association between you and I*

**Whalen:**   *Right   Right   Right   Okay   Let's leave it   Let's leave it and see what happens   Okay   We're done there*

*      *      *

**Whalen:**   *You are reporting probably – are you reporting more on the Perm than the Waha, I suspect?*

**Atha:**     *Yeah   Yeah   I don't have as much size*

**Whalen:**   *I mean, the size I'm putting in the Perm total is like 283   You guys are more than that probably, right?*

**Atha:**     *Yeah   Get up to my Perm   Yeah, we're about 450*

**Whalen:**   *Okay   Good   Then my number is believable*

**Atha:**     *Right*

*      *      *

48.    At McDonald's direction, Atha prepared and electronically delivered, or caused to be delivered, the response to *IFERC's* request for physical gas trade information on July 26, 27, 28, and 31, 2000   The report delivered on July 31, 2000, included the trades reported with Cinergy as the counterparty that McDonald, Atha, and Whalen fabricated during the July 27 and 28 telephone calls identified above, and was also electronically delivered to *NGI* and *Gas Daily*

17

49.    Whalen also prepared and electronically delivered, or caused to be delivered, to *IFERC* a report which included the trades reported with Mirant as the counterparty that Whalen, McDonald and Atha fabricated during the July 27 and 28 telephone calls identified above

50    When Defendants knowingly delivered, or caused to be delivered, the false or misleading or knowingly inaccurate reports, they intended for the indexes to use their reports to calculate the index prices of natural gas.

51.    If the attempted manipulation of the price of natural gas had been successful, it could have affected the price of natural gas, a commodity in interstate commerce, and the price of natural gas futures and options contracts traded on the New York Mercantile Exchange ("NYMEX")

## D.    McDonald, Whalen and Atha Falsely Reported and Attempted to Manipulate the Price of Natural Gas in September/October 2000

52    On September 26. 2000, Atha delivered, or caused to be delivered, the first of three cumulative spreadsheets to *IFERC* reporting that Mirant allegedly had completed a transaction on September 25, 2000 with Enserco Energy. Inc. ("Enserco") at the Questar delivery point (the "fictitious Questar Transaction"). Atha reported a volume of ten million mmBtu and a price of $4.18 per mmBtu

53    On October 2, 2000, an employee from *IFERC*, Kelly Doolan, called Atha to verify the fictitious Questar Transaction  Atha could not provide verification of the fictitious Questar Transaction to Doolan.

54.    Realizing that he could not provide verification of the fictitious Questar Transaction, Atha placed Doolan on hold and contacted McDonald for assistance  McDonald told Atha to tell Doolan that the correct counterparty was Cinergy, and that he (McDonald) would call Whalen at Cinergy to confirm that Whalen would verify the trade to *IFERC*

55.    Atha falsely told Doolan that the fictitious Questar Transaction was originally executed with Enserco, but that the deal was broken and re-executed with Cinergy

56.    While Atha was telling that false story to Doolan at *IFERC*, McDonald called Whalen. The telephone conversation between Whalen and McDonald wherein they both agreed to attempt to manipulate the price of natural gas by submitting fabricated information about the fictitious Questar Transaction was recorded

57    The telephone recording of that conversation details the attempted manipulation, in part, as follows

**McDonald:** *I—we put your name down on a Questar trade.*

**Whalen:**   *Okay*

**McDonald:** *Like 418, yeah, 418 on a Questar deal.*

**Whalen:**   *Okay*

**McDonald:** *If they call you about it, you got any issues with verifying that one?*

**Whalen:**   *No, no, no problem.*

*   *   *

**McDonald:** *Hang on.*

> [To someone else] *What's that?  You mean at Cinergy?  It was WHALEN*
> [To WHALEN] *Yeah, they're calling me right now to verify that deal*

**Whalen:**   *Really?  Why would they verify that –oh, is the 418 just total bullshit as far as like—*

**McDonald:** *Actually, we actually—we want a high Questar, and actually we would like that number not to be there, but we just wanted it to look like it was, you know.*

**Whalen:**   *No, I'm with you   But I mean should it be more like, you know, 395 or something?*

**McDonald:** *No, I think it should be higher   It should be higher*

*   *   *

**McDonald:** *Okay   The story was—I think Atha had put down Enserco on that deal, and then he's saying that we broke the deal and made it with Cinergy instead, if they ask you*

20

**Whalen:**   *[Laughter ] I'm going to say I don't know that trade  I do have—I did however do a trade with Enserco at that price*

58     Later on October 2, 2000, Doolan called Whalen at Cinergy to verify the fictitious Questar Transaction  Even though Whalen had not included that transaction on the *IFERC* report, Whalen falsely told *IFERC* that he executed that transaction with Mirant.

59     To explain why that transaction did not appear on Cinergy's report to *IFERC*, Whalen stated that he must have overlooked it when he was completing Cinergy's *IFERC* spreadsheet.  Doolan thanked Whalen for his assistance and reminded Whalen to be thorough, especially because it was important to the auditing process

60     When Defendants knowingly delivered, or caused to be delivered, the false or misleading or knowingly inaccurate reports, they intended for the indexes to use their reports to calculate the index prices of natural gas

61.     If the attempted manipulation of the price of natural gas had been successful, it could have affected the price of natural gas, a commodity in interstate commerce, and the price of natural gas futures and options contracts traded on the NYMEX

**E.    Whalen Attempted to Manipulate the Price of Natural Gas in December 2000**

62.    On December 8. 2003, again unbeknownst to anyone at Cinergy, Whalen attempted to manipulate the price of natural gas at the Waha delivery point. Specifically, he intended to ensure that the Waha price index came out higher than it would have been had normal market forces alone been at work to establish the index   In furtherance of his attempt to manipulate the Waha index, Whalen called McDonald in Atlanta and asked McDonald to report an artificially high Waha number.

63.    The telephone conversation between Whalen and McDonald wherein Whalen attempted to manipulate the price of natural gas at Waha by submitting fabricated transaction information was recorded. The telephone recording of that conversation details the attempted manipulation, in part, as follows

> **Whalen:**    *Yeah, so   Well, it would help me out if you guys report a high Waha, and we'll buy you dinner if you do it*
>
> **McDonald:** *All right   Well, I don't want to have a recorded phone call saying that we are doing that, but—*
>
> **Whalen:**    *Okay*
>
> **McDonald:** *But I understand what you need.*

64    If the attempted manipulation of the price of natural gas had been successful, it could have affected the price of natural gas, a commodity in interstate

22

commerce, and the price of natural gas futures and options contracts traded on the NYMEX

## V. **Violations of the Commodity Exchange Act**

65.     The allegations contained in paragraphs 1 through 64 above are re-alleged and incorporated by reference into each Count alleged below.

66.     Pursuant to Section 9(a)(2) of the Act, 7 U.S C. § 13(a)(2), it is unlawful for any person "[k]nowingly to deliver or cause  to be delivered for transmission through the mails or interstate commerce by telegraph, telephone, wireless, or other means of communication false or misleading or knowingly inaccurate reports concerning crop or market information or conditions that affect or tend to affect the price of any commodity in interstate commerce. .    "

67     Pursuant to Section 9(a)(2) of the Act, 7 U.S.C  § 13(a)(2), it is unlawful for any person to "[m]anipulate or attempt to manipulate the price of any commodity in interstate commerce or for future delivery on or subject to the rules of any registered entity, including any contract market."

68.     Pursuant to Section 13(a) of the Act, 7 U S.C. § 13c(a), "[a]ny person who commits, or who willfully aids, abets, counsels,      or procures the commission of a violation of this Act,     . or who acts in combination or concert

23

with any other person in any such violation, or who willfully causes an act to be done . . . may be held responsible for such violation as a principal "

69      Sections 6(c) and 6(d) of the Act, 7 U S.C. §§ 9 and 13b, together authorize the Commission to serve a complaint and provide for the imposition of, among other things, fines and penalties if the Commission "has reason to believe that any person   . has manipulated or attempted to manipulate the market price of any commodity, in interstate commerce, or for future delivery on or subject to the rules of any contract market . . . or otherwise is violating or has violated any of the provisions of [the] Act "

### Count I – False Reporting
### (McDonald and Atha)

70.     Defendants McDonald and Atha violated Section 9(a)(2) of the Act, 7 U.S C  § 13(a)(2), when they delivered, or caused to be delivered, for transmission through the mails or interstate commerce by telegraph, telephone, wireless, or other means of communication false or misleading or knowingly inaccurate reports concerning natural gas transactions to *IFERC, Gas Daily* and/or *NGI*, issuers of natural gas price indexes

71      Delivery of false or misleading or knowingly inaccurate reports concerning prices and volumes of natural gas trades to *IFERC, Gas Daily* and *NGI*

amounts to the delivery of information that affects or tends to affect the price of natural gas, a commodity in interstate commerce.

72     Each occasion upon which Defendants McDonald and Atha delivered, or caused to be delivered, for transmission through the mails or interstate commerce by telegraph, telephone, wireless, or other means of communication false or misleading or knowingly inaccurate information concerning natural gas transactions is alleged herein as a separate and distinct violation of Section 9(a)(2) of the Act, 7 U.S.C § 13(a)(2)

73     Based on the conduct described in paragraphs 22, 23 and 38 through 60, Whalen willfully aided, abetted, counseled and worked in combination and concert with Atha and McDonald in their scheme to deliver, or cause to be delivered, false or misleading or knowingly inaccurate reports to indexes in violation of Section 9(a)(2) of the Act, 7 U S.C §13(a)(2) and is therefore also liable for such violations pursuant to Section 13(a) of the Act, 7 U.S.C §13c(a).

74     Each occasion upon which Whalen willfully aided, abetted, counseled and worked in combination and concert with Atha and McDonald in their scheme to deliver, or cause to be delivered, false or misleading or knowingly inaccurate reports to indexes is alleged herein as a separate and distinct violation

## Count II – False Reporting
## (Whalen)

75      Defendant Whalen violated Section 9(a)(2) of the Act, 7 U S.C.

§ 13(a)(2), when he delivered, or caused to be delivered, for transmission through

the mails or interstate commerce by telegraph, telephone, wireless, or other means

of communication false or misleading or knowingly inaccurate reports concerning

natural gas transactions to *IFERC, Gas Daily* and/or *NGI,* issuers of natural gas

price indexes.

76      Delivery of false or misleading, or knowingly inaccurate reports

concerning prices and volumes of natural gas trades to *IFERC, Gas Daily* and *NGI*

amounts to the delivery of information that affects or tends to affect the price of

natural gas, a commodity in interstate commerce

77      Each occasion upon which Defendant Whalen delivered, or caused to

be delivered, for transmission through the mails or interstate commerce by

telegraph, telephone, wireless, or other means of communication false or

misleading or knowingly inaccurate information concerning natural gas

transactions is alleged herein as a separate and distinct violation of Section 9(a)(2)

of the Act, 7 U.S C. § 13(a)(2).

78.     Based on the conduct described in paragraphs 38 through 60, Atha

and McDonald willfully aided, abetted, counseled and worked in combination and

concert with Whalen in his scheme to deliver, or cause to be delivered, false or misleading or knowingly inaccurate reports to indexes in violation of Section 9(a)(2) of the Act, 7 U S C §13(a)(2) and are therefore also liable for such violations pursuant to Section 13(a) of the Act, 7 U.S.C §13c(a).

79.    Each occasion upon which Atha and McDonald willfully aided, abetted, counseled and worked in combination and concert with Whalen in his scheme to deliver, or cause to be delivered, false or misleading or knowingly inaccurate reports to indexes is alleged herein as a separate and distinct violation.

### Count III – Attempted Manipulation
### (McDonald, Atha, and Whalen)

80.    Defendants violated Sections 6(c), 6(d) and 9(a)(2) of the Act, 7 U.S.C. §§ 9, 13b, and 13(a)(2) when they attempted to manipulate the price of natural gas, a commodity in interstate commerce   Defendants had the specific intent to manipulate the price of natural gas at multiple delivery points when they engaged in the overt act(s) of delivering, causing to be delivered, and/or coordinating with each other to deliver or cause to be delivered through the mails or interstate commerce by telegraph, telephone, wireless, or other means of communication false or misleading or knowingly inaccurate reports concerning natural gas transactions to issuers of natural gas price indexes

27

81      Each occasion upon which Defendants attempted to manipulate the price of natural gas at each individual delivery point is alleged herein as a separate and distinct violation of Sections 6(c), 6(d) and 9(a)(2) of the Act, 7 U S C  §§ 9, 13b, and 13(a)(2).

82.     Based on the conduct described in paragraphs 38 through 60, Defendants willfully aided, abetted, counseled, and worked in combination and concert with each other in their schemes to manipulate the price of natural gas, a commodity in interstate commerce, and are therefore also liable for such violations pursuant to Section 13(a) of the Act, 7 U.S C. §13c(a).

83      Each occasion upon which Defendants willfully aided, abetted, counseled and worked in combination and concert with each other in their scheme to manipulate the price of natural gas is alleged herein as a separate and distinct violation

## VI.  Relief Requested

WHEREFORE, Plaintiff Commission respectfully requests that this Court enter an order of permanent injunction·

A      Restraining and enjoining Defendants and any of their affiliates, agents, servants, employees, successors, assigns, attorneys, and all persons in active concert with them who receive actual notice of such order by

personal service or otherwise, from directly or indirectly violating Sections
6(c), 6(d), and 9(a)(2) of the Act, 7 U.S C §§ 9, 13b, and 13(a)(2);

B       Directing Defendants to pay civil monetary penalties, to be assessed
by the Court against the Defendants, in amounts not to exceed $110,000 for
each violation of the Act occurring before October 23, 2000 and $120,000
for each violation occurring on or after October 23, 2000, or triple the
monetary gain to them for each violation of the Act, as described herein;

C       Directing Defendants to disgorge, pursuant to such procedure as the
Court may order, all benefits received from the acts or practices which
constitute violations of the Act or Regulations, as described herein, and
interest thereon from the date of such violations;

D.      Directing Defendants, pursuant to such procedure as the Court may
order, to make full restitution of funds received by them as a result of acts
and practices which constituted violations of the Act and Regulations, as
described, and interest thereon from the date of such violations, and

E     Providing for such other and further remedial and ancillary relief as
this Court may deem necessary and appropriate

**Respectfully Submitted,**

**UNITED STATES COMMODITY
FUTURES TRADING COMMISSION**

By. *Laura Bonander*

Laura Bonander, GA Bar No · 696541
Assistant United States Attorney
United States Attorney's Office
Richard B. Russell Federal Building
75 Spring Street, S.W., Suite 600
Atlanta, GA 30303-3309
phone 404 581-6000
fax     404 581-6181

Kathleen M. Banar, Chief Trial Attorney
Michael J Otten, Senior Trial Attorney
Anne M Termine, Trial Attorney
Commodity Futures Trading Commission
Division of Enforcement
1155 21st Street, NW,
Washington, D.C  20581
phone· (202) 418-5000/5335/5388
fax: (202) 418-5531