## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES COMMODITY FUTURES TRADING COMMISSION, ) ) ) | |
| Plaintiff, ) ) ) ) | **(Proposed) Consent Order Of Permanent Injunction And Other Relief Against Christopher McDonald** |
| vs. ) ) ) ) | |
| PAUL ATHA, CHRISTOPHER McDONALD and MICHAEL WHALEN, ) ) ) ) | **Civil Action No.: 1:05-cv-0293-JOF** |
| Defendants. ) ) | |

## I.     BACKGROUND

1.     On February 1, 2005 the U.S. Commodity Futures Trading Commission ("Commission") filed its complaint in the above-captioned action against Defendant Christopher McDonald ("McDonald") and others, seeking injunctive and other equitable relief, including a civil monetary penalty, for violations of the Commodity Exchange Act ("Act"), as amended , 7 U.S.C. §§ 1 *et seq.* (2000) (the "Complaint").

2.      In particular, the Complaint alleges that during the period beginning approximately January 2000 and ending in late 2000 or early 2001 ("relevant time period"), McDonald violated Sections 6(c), 6(d) and 9(a)(2) of the Act, 7 U.S.C. §§ 9, 13b, and 13(a)(2), by knowingly delivering false or misleading or knowingly inaccurate reports of market information to natural gas price indexes and by intentionally attempting to manipulate the price of natural gas, and is also responsible for aiding and abetting two other traders in doing so.

## II.    CONSENTS AND AGREEMENTS

1.      To effect a settlement of the matters alleged in the Complaint in this action without a trial or adjudication on the merits or further judicial proceedings, McDonald:

        a.      Consents to the entry of this Consent Order of Permanent Injunction and Other Relief against Christopher McDonald ("Order");

        b.      Affirms that he has read and agreed to this Order voluntarily, and that no threat, or promise other than as set forth specifically herein, has been made by the Commission or any member, officer, agent or representative thereof, or by any other person, to induce consent to this Order;

        c.      Acknowledges service of the Summons and Complaint;

d.      Admits that this Court has jurisdiction over him and the subject matter of this action pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1;

e.      Admits that venue properly lies with this Court pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1;

f.      Waives:

i.      All claims which may be available under the Equal Access to Justice Act ("EAJA"), 5 U.S.C. § 504 and 28 U.S.C. § 2412 (2000), relating to, or arising from, this action and any right under EAJA to seek costs, fees and other expenses relating to, or arising from this action;

ii.      Any claim of Double Jeopardy based upon the institution of this proceeding or the entry in this proceeding of any order imposing a civil monetary penalty or any relief; and

iii.      Any rights of appeal from this Order;

g.      Consents to the continued jurisdiction of this Court for the purpose of enforcing the terms and conditions of this Order, to assure compliance with the Order, and for any other purposes relevant to this case, even if McDonald now or in the future resides outside the jurisdiction;

h.      Agrees that neither McDonald nor any of his agents or employees under his authority or control shall take any action or make any public

3

statement denying, directly or indirectly, any allegation in the Complaint or findings or conclusions in the Order or creating, or tending to create, the impression that the Complaint or this Order is without a factual basis; provided, however, that nothing in this provision shall affect McDonald's (a) testimonial obligations; or (b) right to take legal positions in other proceedings to which the Commission is not a party.  McDonald shall take all necessary steps to ensure that all of his agents or employees understand and comply with this agreement; and

       i.     Agrees to cooperate with Commission staff in the continuing litigation of this matter against any defendant not a party to this Order.  As part of such cooperation, McDonald agrees, subject to all applicable privileges, to comply fully, promptly and truthfully to any inquires or requests for information or testimony, including but not limited to, testifying completely and truthfully at any trial or hearing in this action subject to the provisions of subparagraph h, above, or producing written statements or trial declarations to the Commission related to any trial of the subject matter of this proceeding.

      2.     By consenting to the entry of this Order, McDonald neither admits nor denies the allegations of the Complaint or the Findings of Fact and Conclusions of Law contained in this Order, except as to jurisdiction and venue, which he admits. However, McDonald agrees, and the parties to this Order intend, that the

allegations of the Complaint and the Findings of Fact made by this Court shall be taken as true and correct and given preclusive effect, without further proof, in any proceeding in bankruptcy or to enforce the terms of this Order.  McDonald shall provide immediate notice to this Court and the Commission via certified mail of any bankruptcy proceeding filed by, on behalf of, or against him, and shall provide immediate notice of any change of address, telephone number, or contact information.

### III.   FINDINGS OF FACT AND CONCLUSIONS OF LAW

1.     The Court, being fully advised in the premises, finds that there is good cause for the entry of this Order and that there is no just reason for delay.  The Court therefore directs the entry of Findings of Fact, Conclusions of Law, and a permanent injunction and ancillary relief pursuant to § 6c of the Act, 7 U.S.C. § 13a-1, as set forth herein.

### FINDINGS OF FACT

**A.     The Commodity Exchange Act**

2.     The Act, 7 U.S.C. §§ 1 *et seq.*, and the Commodity Futures Trading Commission's Regulations ("Regulations"), 17 C.F.R. §§ 1.1 *et seq.* (2005), establish a comprehensive system for regulating the purchase and sale of commodities in interstate commerce or for future delivery on or subject to the rules

of a contract market.  One of the primary purposes of the Act is to protect against price manipulation.

**B.     The Commission**

3.      Plaintiff Commission is an independent federal regulatory agency charged with the administration and enforcement of the Act, 7 U.S.C. §§ 1 *et seq.*, and the Regulations promulgated there under, 17 C.F.R. §§ 1.1 *et seq.*

**C.     McDonald**

4.      McDonald resides in Atlanta, Georgia.  During the relevant time period, McDonald was employed in Atlanta at Mirant America's Energy Marketing, L.P. ("Mirant") as Vice President and Chief Commercial Officer and Director of trading for the western region of the United States ("West Desk"). Both positions required McDonald to supervise natural gas traders and marketers. McDonald himself also traded and marketed a variety of instruments, including contracts for fixed price and index-based over-the-counter natural gas.

**D.     Other Natural Gas Traders Involved**

5.      "Trader A" was a natural gas trader for Mirant during the relevant time period, trading natural gas for the West Desk.  McDonald supervised Trader A.

6.      During the relevant time period, "Trader C" was employed by a publicly-held energy company (hereinafter "Company Y"), where he traded natural gas, including physical and financial products.

**E.      The Natural Gas Price Indexes**

7.      Natural gas is a commodity typically transported in interstate commerce through a network of pipelines across the United States.  Mirant and Company Y buy and sell natural gas for profit and their traders engage in transactions calling for the actual physical delivery of natural gas ("physical trades").

8.      Physical trades are typically priced with either a fixed price set at the time of the transaction or with reference to an index to be set at a later date.

9.      During the relevant time period, natural gas traders and companies, including McDonald, Trader A and Trader C reported natural gas market information to companies that calculated natural gas price indexes ("indexes"). The indexes included *Inside FERC Gas Market Report ("IFERC"), Gas Daily,* and *Natural Gas Intelligence (NGI").*

10.     The reported market information included price and volume information for natural gas transactions entered into by market participants for delivery at a specific location or hub.

11.     Participants in the natural gas industry widely used these price indexes to determine price and settlement of index trades, as well as to assess price risks.

12.     The price and volume information reported to those indexes was market information that affects or tends to affect the price of natural gas, a commodity in interstate commerce.

**F.      McDonald Regularly Falsely Reported and Attempted to Manipulate the Price of Natural Gas**

13.     During the relevant time period, *IFERC* sent to Trader A by electronic mail a monthly request for various categories of transaction information by electronic mail via the Internet.  Attached to the request was a spreadsheet seeking price, volume and other transaction information regarding Mirant's fixed-price baseload natural gas trades executed during bidweek.  A baseload deal is a trade requiring the delivery of a specific quantity of natural gas on each day of the following month.  Bidweek refers to the last four to five trading days of each month.

14.     During the relevant time period, Trader A completed the spreadsheet each month and electronically delivered it, or caused it to be delivered, back to *IFERC*.  He did so as many as four times during each bidweek – usually once each day with daily cumulative additions.  On the last day of each bidweek, Trader A

also delivered, or caused to be delivered, the completed spreadsheet to *Gas Daily* and *NGI*.

15.    In preparing the spreadsheet to send to *IFERC*, Trader A fabricated prices, volumes and trade dates based upon, among other things, price and volume information submitted to him by McDonald and other West Desk traders, and McDonald's instructions.

16.    The price and volume information McDonald provided to Trader A did not reflect his (McDonald's) or any other Mirant trader's actual baseload deals negotiated during bidweek.  Because he was Trader A's supervisor, McDonald knew that Trader A would include the price and volume information provided by him (McDonald) in the reports to the indexes.

17.    Before Trader A delivered, or caused to be delivered, the spreadsheet with the fabricated trades to the indexes, McDonald reviewed the spreadsheet and directed any changes that he wanted made.

18.    In preparing the spreadsheet, Trader A ensured that the sum of the fabricated trades equaled the predetermined total volume and weighted average prices he and McDonald wanted to report.

19.    For many of the fabricated trades included in the spreadsheet, McDonald and Trader A made up counterparties, *i.e.*, falsely identifying larger, more active, companies as the purported counterparties to the transactions.

20.    As a result of this scheme, McDonald knowingly delivered, or caused to be delivered, to *IFERC*, *Gas Daily*, and *NGI* reports concerning hundreds of natural gas trades.  Most, if not all, of the submitted reports contained false or misleading or knowingly inaccurate information in the form of a fabricated price, fabricated volume, fabricated counterparty, and/or fabricated delivery point.

21.    The false or misleading or knowingly inaccurate reports McDonald delivered, or caused to be delivered, to *IFERC*, *Gas Daily*, and/or *NGI* was market information that affects or tends to affect the price of natural gas, a commodity in interstate commerce, and McDonald knowingly delivered, or caused to be delivered, those reports in an attempt to manipulate the price of natural gas, a commodity in interstate commerce.

22.    If the manipulation of the price of natural gas had been successful, it could have affected the price of natural gas, a commodity in interstate commerce, and the price of natural gas futures and options contracts traded on the New York Mercantile Exchange ("NYMEX").

**G.    McDonald Falsely Reported and Attempted to Manipulate the Price of Natural Gas in July/August 2000**

23.    On July 27, 2000, McDonald telephoned Trader C at Company Y and told Trader C that he (McDonald) wanted the August *IFERC* index price of natural gas at the Permian delivery point to be low.  During the call, which was recorded as part of Mirant and Company Y's routine business practice, McDonald stated, "I'd like a low Permian index.  Do you need the same?," to which Trader C responded, "Yeah, oh yeah, absolutely."

24.    McDonald told Trader C that he (McDonald) would report natural gas trades for the Permian delivery point at fabricated prices and/or volumes in an attempt to ensure that the August *IFERC* Permian index price of natural gas was lower than it otherwise would have been.

25.    In order to ensure that the reports would carry greater weight with *IFERC*, McDonald told Trader C that he (McDonald) would falsely identify Company Y as the counterparty to the transactions.

26.    Trader C agreed to assist McDonald with his attempt to achieve a "low Permian index" by submitting false volume, price and other transaction data, and falsely identifying Mirant and Company Y as parties to the transactions.

27.    McDonald's July 27, 2000 recorded telephone call to Trader C revealed that McDonald and Trader C intended to manipulate the price of natural gas at the Permian delivery point, as well as multiple other delivery points.

28.    In an attempt to further coordinate the false reporting of natural gas transactions, Trader C telephoned McDonald on July 28, 2000 to make sure that the false or misleading or knowingly inaccurate reports each agreed to report to *IFERC* would match.  During that telephone call, which was also recorded, Trader C stated,

> I'm going to send it in as a blanket sheet, and I'll need to put like a bunch of other companies on there as well, right, to make it more believable?

They then fabricated trades at various locations to submit to *IFERC* and agreed that each would identify the other as the counterparty.

29.    Later in the day on July 28, 2000, Trader C telephoned Trader A to finalize the list of fabricated trades that McDonald and Traders A and B would falsely report to *IFERC* as trades having been executed between Mirant and Company Y, again to ensure that the prices and volumes they were going to report would be "believable" to *IFERC*.

30.    Trader A prepared and electronically delivered, or caused to be delivered, to *IFERC* physical gas trade information on July 26, 27, 28, and 31,

2000. The report delivered on July 31, 2000, included the trades that McDonald, Trader C, and Trader A fabricated during the July 27 and 28 recorded telephone calls identified above. The same reports were electronically delivered by Trader A to *NGI* and *Gas Daily* with McDonald's knowledge and consent.

31.   Trader C also prepared and electronically delivered, or caused to be delivered, to *IFERC* a report which included the trades that McDonald, Trader C and Trader A fabricated during the July 27 and 28 recorded telephone calls identified above.

32.   McDonald knowingly delivered, or caused to be delivered, the false or misleading or knowingly inaccurate reports, intending for the indexes to use these reports to calculate the index prices of natural gas.

33.   If the attempted manipulation of the price of natural gas had been successful, it could have affected the price of natural gas, a commodity in interstate commerce, and the price of natural gas futures and options contracts traded on the NYMEX.

**H.   McDonald Falsely Reported and Attempted to Manipulate the Price of Natural Gas in September/October 2000**

34.   On September 26, 2000, Trader A delivered, or caused to be delivered, the first of three cumulative spreadsheets to *IFERC* reporting that Mirant allegedly had completed a transaction on September 25, 2000 with Enserco

Energy, Inc. ("Enserco") at the Questar delivery point (the "fictitious Questar Transaction"). Trader A's report included both price and volume information for the fictitious Questar Transaction.

35.    On October 2, 2000, a reporter from *IFERC* telephoned Trader A to verify the fictitious Questar Transaction. Trader A could not provide verification of the fictitious Questar Transaction to the *IFERC* reporter.

36.    Realizing that he could not provide verification of the fictitious Questar Transaction, Trader A placed the *IFERC* reporter on hold and contacted McDonald for assistance. McDonald told Trader A to falsely tell the *IFERC* reporter that the correct counterparty was Company Y, and further advised Trader A that he (McDonald) would telephone Trader C at Company Y to confirm that Trader C would verify the trade to *IFERC*.

37.    Trader A falsely told the *IFERC* reporter that the fictitious Questar Transaction was originally executed with Enserco, but that the deal was broken and re-executed with Company Y.

38.    While Trader A was telling that false story to the *IFERC* reporter, McDonald telephoned Trader C and in a recorded call, secured his (Trader C's) agreement to provide the same false information to the *IFERC* reporter.

14

39.     Later on October 2, 2000, the *IFERC* reporter telephoned Trader C at Company Y to verify the fictitious Questar Transaction, and Trader C falsely told *IFERC* that he executed that transaction with Mirant.

40.     McDonald knowingly delivered, or caused to be delivered, the false or misleading or knowingly inaccurate reports containing the fictitious Questar transaction, intending for the index to use these reports to calculate the index prices of natural gas.

41.     If the attempted manipulation of the price of natural gas had been successful, it could have affected the price of natural gas, a commodity in interstate commerce, and the price of natural gas futures and options contracts traded on the NYMEX.

## **CONCLUSIONS OF LAW**

42.     Section 6c of the Act authorizes the Commission to file a complaint for injunctive relief in the appropriate District Court "whenever it appears that . . . any person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision" of the Act.  7 U.S.C. § 13a-1(a).  The plain language of the Act authorizes an injunctive action based solely upon past conduct.

43.    Sections 6(c) and 6(d) of the Act, 7 U.S.C. §§ 9 and 13b, together authorize the Commission to serve a complaint and provide for the imposition of, among other things, fines and penalties if the Commission "has reason to believe that any person . . . has manipulated or attempted to manipulate the market price of any commodity, in interstate commerce, or for future delivery on or subject to the rules of any contract market . . . or otherwise is violating or has violated any of the provisions of [the] Act."

**McDonald Violated Section 9(a)(2) of the Act**
**By Submitting False, Misleading or Knowingly Inaccurate Reports**

44.    Section 9(a)(2) of the Act, 7 U.S.C. § 13(a)(2), makes it unlawful for any person to "[k]nowingly to deliver or cause to be delivered for transmission through the mails or interstate commerce by telegraph, telephone, wireless, or other means of communication false or misleading or knowingly inaccurate reports concerning crop or market information or conditions that affect or tend to affect the price of any commodity in interstate commerce[.]" *See United States v. Valencia,* 394 F.3d 352, 357 (5th Cir. 2004) (false reporting is actionable under Section 9(a)(2) of the Act, 7 U.S.C. § 13(a)(2)); *United States Commodity Futures Trading Commission v. Johnson*, 408 F.Supp.2d 259 (S.D. Tex. 2005) (holding the same); *United States Commodity Futures Trading Commission v. Bradley*, 408 F.Supp.2d

1214 (N.D. OK 2005) (also holding the same); *see also*, *United Egg Producers v. Bauer Int'l Corp.*, 311 F. Supp. 1375, 1383 (S.D.N.Y. 1970) (concluding that false press releases regarding egg importation "tended to affect the price of eggs in interstate commerce"); *In re Soybean Futures Litig.*, 892 F. Supp. 1025, 1046 (N.D. Ill. 1995) (concluding that false reports can influence prices and constitute part of a manipulation claim).

45.     By his conduct set forth above, McDonald violated Section 9(a)(2) of the Act, 7 U.S.C. § 13(a)(2) when he knowingly delivered, or caused to be delivered, false or misleading or knowingly inaccurate reports concerning natural gas transactions, including fabricated trades, to the index publications.

46.     The false or misleading or knowingly inaccurate reports McDonald delivered, or caused to be delivered, to the index publications contained market information that affects or tends to affect the price of natural gas, a commodity in interstate commerce.

## McDonald Violated Section 9(a)(2) of the Act
## By Attempting to Manipulate the Price of Natural Gas

47.    Section 9(a)(2), 7 U.S.C. § 13(a)(2), makes it unlawful for any person

"to manipulate or attempt to manipulate the price of any commodity in interstate

commerce, or for future delivery[.]"

48.    The following elements are required to prove an attempted

manipulation:  (i) an intent to affect the market price; and (ii) some overt act in

furtherance of that intent.  *See Commodity Futures Trading Commission v. Atha, et*

*al.*, 2006 WL 687728, *6 (N.D. Ga. 2006) (citing *In re Hohenberg Bros. Co.,*

[1975-1977 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 20,271 at 21,477

(CFTC Feb. 18, 1977)).  To prove the intent element of manipulation or attempted

manipulation, it must be shown that the defendant "acted (or failed to act) with the

purpose or conscious object of causing or effecting a price or price trend in the

market that did not reflect the legitimate forces of supply and demand." *In re*

*Indiana Farm Bureau Cooperative Association*, [1982-1984 Transfer Binder]

Comm. Fut. L. Rep. (CCH) ¶ 21,796 at 27,281 (CFTC Dec. 17, 1982).  "[I]ntent is

the essence of manipulation." *Id.* at 27,282.

49.    McDonald specifically intended to manipulate the price of natural gas

at multiple delivery points when he engaged in the overt act(s) of delivering,

18

causing to be delivered, and/or coordinating with Trader A and Trader C to deliver or cause to be delivered, through the mails or interstate commerce by telegraph, telephone, wireless, or other means of communication, false or misleading or knowingly inaccurate reports concerning natural gas transactions to issuers of natural gas price indexes.

50.     By his conduct set forth above, McDonald violated Sections 6(c), 6(d), and 9(a)(2) of the Act, 7 U.S.C. §§ 9, 13b and 13(a)(2), when he attempted to manipulate the price of natural gas, a commodity in interstate commerce.

**By Aiding and Abetting the False Reporting and Attempted Manipulations of Traders A and C, McDonald Is Also Responsible for their Actions Pursuant to Section 13(a) of the Act**

51.     Pursuant to Section 13(a) of the Act, 7 U.S.C. § 13c(a), "[a]ny person who commits, or who willfully aids, abets, counsels, . . . or procures the commission of a violation of this Act, . . . or who acts in combination or concert with any other person in any such violation, or who willfully causes an act to be done . . . may be held responsible for such violation as a principal."

52.     Based on the conduct set forth above, McDonald willfully aided, abetted, counseled and worked in combination and concert with Traders A and C in the scheme to deliver, or cause to be delivered, false or misleading or knowingly

inaccurate reports to indexes in violation of Section 9(a)(2) of the Act, 7 U.S.C. §

13(a)(2) and is therefore also responsible for such violations pursuant to Section

13(a) of the Act, 7 U.S.C. §13c(a).

### IV.    ORDER FOR PERMANENT INJUNCTION

With the consent of the Commission and McDonald, **IT IS NOW HEREBY**

**ORDERED THAT**:

1.    McDonald is permanently restrained, enjoined and prohibited from

directly or indirectly engaging in any conduct that violates Sections 6(c), 6(d), and

9(a)(2) of the Act, 7 U.S.C. §§ 9, 13b and 13(a)(2), including:

   a.    Reporting any false, misleading or knowingly inaccurate

         information regarding crop or market information or conditions

         that affect or tend to affect the price of any commodity in

         interstate commerce; and

   b.    Manipulating or attempting to manipulate the price of any

         commodity in interstate commerce or for future delivery on or

         subject to the rules of a registered entity.

2.    McDonald is permanently restrained, enjoined and prohibited from

applying for registration or engaging in any activity requiring such registration, or

acting as a principal (as defined by the National Futures Association Registration

Rule 101) of any registered entity or person, or entity or person required to be registered.

3.     The injunctive provisions of this Order shall be binding on McDonald, upon any person acting in the capacity of officer, agent, servant, or employee of McDonald, and upon any person who receives actual notice of this Consent Order by personal service or otherwise insofar as he or she is acting in active concert or participation with McDonald.

## V.     ORDER FOR CIVIL MONETARY PENALTY AND OTHER ANCILLARY RELIEF

With the consent of the Commission and McDonald, **IT IS NOW HEREBY ORDERED** that McDonald shall comply fully with the following terms, conditions and obligations relating to the payment of a civil monetary penalty.

1.     A civil monetary penalty in the amount of three hundred and fifty thousand dollars ($350,000) is assessed against McDonald, and is due and owing ten days from the date of this Order, plus post-judgment interest pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1.

2.     Post-judgment interest shall accrue beginning on the date payment is due and shall be determined by using the Treasury Bill rate prevailing on the date of this Order pursuant to 28 U.S.C. § 1961.

3.     McDonald shall pay this penalty by making electronic funds transfer, U.S. postal money order, certified check, bank cashier's check, or bank money order made payable to the Commodity Futures Trading Commission and sent to the attention of the Office of Cooperative Enforcement, Division of Enforcement, CFTC, Three Lafayette Centre, 1155 21st Street, N.W., Washington, D.C. 20581. McDonald shall accompany payment of the penalty with a cover letter that identifies himself, and the name and docket number of this proceeding.  McDonald shall simultaneously transmit a copy of the cover letter and the form of payment to the Director, Division of Enforcement, CFTC, Three Lafayette Centre, 1155 21st N.W., Washington, D.C. 20581.

## VI.     <u>MISCELLANEOUS PROVISIONS</u>

1.     <u>Notices.</u>  All notices required by this Order shall be sent by certified mail, return receipt requested, as follows:

        a.     Notice to Plaintiff Commission:

            Division of Enforcement
            Commodity Futures Trading Commission
            1155 21st Street, NW
            Washington, DC 20581

        b.     Notice to Defendant Christopher McDonald:
            c/o the Law Office of John M. Fedders, Esq.
            1914 Sunderland Place, N.W.
            Washington, D.C. 20036

2.      Successors and Assigns.  This Order shall inure to the benefit of and be binding on the parties' successors, assigns, heirs, beneficiaries and administrators.

3.      Counterparts.  This Order may be executed by the parties in counterparts and by facsimile.

4.      Entire Agreement, Amendments and Severability.  This Order incorporates all of the terms and conditions of the settlement among the parties. Nothing shall serve to amend or modify this Order in any respect whatsoever, unless:  (1) reduced to writing, (2) signed by all parties, and (3) approved by order of the Court.

5.      Invalidation:  If any provision of this Order, or if the application of any provisions or circumstances is held invalid, the remainder of the Order and the application of the provisions to any other person or circumstance shall not be affected by the holding.

6.      Waiver:  The failure of any party hereto at any time or times to require performance of any provision hereof shall in no manner affect the right of such party at a later time to enforce the same or any other provision of this Order.  No waiver in one or more instances of the breach of any provision contained in this

Order shall be deemed to be or construed as a further or continuing waiver of such breach or waiver of the breach of any other provision of this Order.

7.     Acknowledgements:  McDonald understands and acknowledges that this Order must be accepted and ratified by the Commission before it becomes final.  However, McDonald understands and agrees that by his signature he is bound by the terms and conditions of this Order, unless the Commission refuses to accept and ratify the Order.

Upon being served with copies of this Order after entry by the Court, McDonald shall sign an acknowledgment of such service and serve such acknowledgment on the Court and the Commission within seven (7) calendar days.

8.     Continuing Jurisdiction of this Court.  Upon entry of this Order, this case shall be dismissed with prejudice as to McDonald, and the Court shall retain jurisdiction of this cause to assure compliance with this Order and for all other purposes related to this action.

**WHEREFORE**, there being no just reason for delay, the Clerk of the Court is hereby directed to enter this Consent Order of Permanent Injunction and Other Relief Against Defendant Christopher McDonald.

Dated: ~~June~~ *Aug. 22*, 2006

Consented to and approved for entry by:

John M. Fedders, Esq.
Law Office of John M. Fedders
1914 Sunderland Place, N.W.
Washington, D.C. 20036
Counsel for Defendant

Dated: ~~June~~ *September* 6, 2006

Wilmer Parker, Esq.
Gillen, Parker & Withers
One Securities Centre, Suite 1050
3490 Piedmont Road, N.E.
Atlanta, GA 30305
Local Counsel for Defendant

Dated: June _____, 2006

Christopher McDonald

Dated: June _____, 2006

Kathleen M. Banar, Esq.
(Admitted *pro hac vice*)
Anne M. Termine, Esq.
(Admitted *pro hac vice*)
Commodity Futures Trading Commission
Three Lafayette Centre
1155 21st Street, N.W.
Washington, DC 20581
Counsel for Plaintiff

Consented to and approved for entry by:

Dated: June _____, 2006

_____
John M. Fedders, Esq.
Law Office of John M. Fedders
1914 Sunderland Place, N.W.
Washington, D.C. 20036
Counsel for Defendant

Dated: June _____, 2006

_____
Wilmer Parker, Esq.
Gillen, Parker & Withers
One Securities Centre, Suite 1050
3490 Piedmont Road, N.E.
Atlanta, GA 30305
Local Counsel for Defendant

Dated: June _____, 2006

_____
Christopher McDonald

Dated: June _____, 2006

_____
Kathleen M. Banar, Esq.
(Admitted *pro hac vice*)
Anne M. Termine, Esq.
(Admitted *pro hac vice*)
Commodity Futures Trading Commission
Three Lafayette Centre
1155 21st Street, N.W.
Washington, DC 20581
Counsel for Plaintiff

Dated: ~~June~~ *August* 24 , 2006

_Laura Bonander_

Laura Bonander, Esq.
Assistant United States Attorney
600 U.S. Courthouse
75 Spring Street, S.W.
Atlanta, Georgia 30303
Local Counsel for Plaintiff

Ordered on this 17th day of ___November___, 2006.

s/ J. Owen Forrester

HON. J. Owen Forrester
UNITED STATES DISTRICT JUDGE

26