**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| UNITED STATES COMMODITY FUTURES TRADING COMMISSION, | ) ) ) | |
| Plaintiff, | ) ) ) ) | (Proposed) Consent Order Of Permanent Injunction And Other Relief Against Paul Atha |
| vs. | ) ) ) | |
| PAUL ATHA, CHRISTOPHER McDONALD and MICHAEL WHALEN, | ) ) ) ) | Civil Action No.: 1:05-cv-0293-JOF |
| Defendants. | ) ) | |

## I.    BACKGROUND

1.    On February 1, 2005 the U.S. Commodity Futures Trading Commission ("Commission") filed its complaint in the above-captioned action against Defendant Paul Atha ("Atha") and others, seeking injunctive and other equitable relief, including a civil monetary penalty, for violations of the Commodity Exchange Act, as amended ("Act"), 7 U.S.C. §§ 1 *et seq.* (2000) (the "Complaint").

2.     In particular, the Complaint alleges that during the period beginning approximately January 2000 and ending in late 2000 or early 2001 (the "relevant period"), Atha violated Sections 6(c), 6(d) and 9(a)(2) of the Act, 7 U.S.C. §§ 9, 13b, and 13(a)(2), by knowingly delivering false or misleading or knowingly inaccurate reports of market information to natural gas price indexes and by intentionally attempting to manipulate the price of natural gas, and is also responsible for aiding and abetting two other traders in doing so.

## II.     CONSENTS AND AGREEMENTS

1.     To effect a settlement of the matters alleged in the Complaint in this action without a trial or adjudication on the merits or further judicial proceedings, Atha:

a.     Consents to the entry of this Consent Order of Permanent Injunction and Other Relief ("Order");

b.     Affirms that he has read and agreed to this Order voluntarily, and that no threat, or promise other than as set forth specifically herein, has been made by the Commission or any member, officer, agent or representative thereof, or by any other person, to induce consent to this Order;

c.     Acknowledges service of the Summons and Complaint;

d. Admits that this Court has jurisdiction over him and the subject matter of this action pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1;

e. Admits that venue properly lies with this Court pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1;

f. Waives:

i. All claims which may be available under the Equal Access to Justice Act (EAJA), 5 U.S.C. § 504 and 28 U.S.C. § 2412 (2000), relating to, or arising from, this action and any right under EAJA to seek costs, fees and other expenses relating to, or arising from this action;

ii. Any claim of Double Jeopardy based upon the institution of this proceeding or the entry in this proceeding of any order imposing a civil monetary penalty or any relief; and

iii. Any rights of appeal in this action;

g. Consents to the continued jurisdiction of this Court for the purpose of enforcing the terms and conditions of this Order, to assure compliance with the Order, and for any other purposes relevant to this case, even if Atha now or in the future resides outside the jurisdiction; and

h. Agrees that neither Atha nor any of his agents or employees under his authority or control shall take any action or make any public statement

denying, directly or indirectly, any allegation in the Complaint or findings or conclusions in the Order or creating, or tending to create, the impression that the Complaint or this Order is without a factual basis; provided, however, that nothing in this provision shall affect Atha's (a) testimonial obligations; or (b) right to take legal positions in other proceedings to which the Commission is not a party. Atha shall take all necessary steps to ensure that all of his agents or employees understand and comply with this agreement.

2.      By consenting to the entry of this Order, Atha neither admits nor denies the allegations of the Complaint or the Findings of Fact and Conclusions of Law contained in this Order, except as to jurisdiction and venue, which he admits. However, Atha agrees, and the parties to this Order intend, that the allegations of the Complaint and all of the findings of fact and conclusions of law contained in this Order shall be taken as true and correct and given preclusive effect, without further proof, in any proceeding in bankruptcy or in the course of any subsequent action to enforce the terms of this Order. Atha shall provide immediate notice to this Court and the Commission via certified mail of any bankruptcy proceeding filed by, on behalf of, or against him, and shall provide immediate notice of any change of address, telephone number, or contact information.

4

## III.   FINDINGS OF FACT AND CONCLUSIONS OF LAW

1.     The Court, being fully advised in the premises, finds that there is good cause for the entry of this Order and that there is no just reason for delay.  The Court therefore directs the entry of Findings of Fact, Conclusions of Law, and a permanent injunction and ancillary relief pursuant to § 6c of the Act, 7 U.S.C. § 13a-1, as set forth herein.

## FINDINGS OF FACT

### A.     The Commodity Exchange Act

2.     The Act, 7 U.S.C. §§ 1 *et seq.*, and the Commission's Regulations ("Regulations"), 17 C.F.R. §§ 1.1 *et seq.* (2005), establish a comprehensive system for regulating the purchase and sale of commodities in interstate commerce or for future delivery on or subject to the rules of a contract market.  One of the primary purposes of the Act is to protect against price manipulation.

### B.     The Commission

3.     Plaintiff Commission is an independent federal regulatory agency charged with the administration and enforcement of the Act, 7 U.S.C. §§ 1 *et seq.*, and the Regulations promulgated there under, 17 C.F.R. §§ 1.1 *et seq.*

**C.     Atha**

4.      Atha currently resides in Houston, Texas.  During the relevant period,
Atha resided in Dunwoody, Georgia, and was employed in Atlanta, Georgia at
Mirant America's Energy Marketing, L.P. ("Mirant") as a natural gas trader for the
western region of the United States ("West Desk").  In that capacity, Atha traded
off-exchange natural gas physical "cash" contracts, and reported to and was
supervised by codefendant Christopher McDonald ("McDonald").

**D.     Codefendants Christopher McDonald and Michael Whalen**

5.      During the relevant period, McDonald was employed in Atlanta,
Georgia at Mirant as Vice President and Chief Commercial Officer and Director of
trading for the West Desk.  Both positions required McDonald to supervise natural
gas traders and marketers, such as Atha.  McDonald himself also traded and
marketed a variety of instruments, including contracts for fixed price and index-
based over-the-counter natural gas.

6.      During the relevant period, Michael Whalen ("Whalen") was
employed by Cinergy Corporation ("Cinergy") as the Director of Financial Trading
with Cinergy's Energy Commodities Business Unit.  In that position, Whalen
traded off-exchange natural gas financial and physical contracts.  Prior to working

at Cinergy, Whalen was employed as a natural gas trader by Mirant (or its predecessor company) in Atlanta, Georgia where he reported to McDonald.

### E.    The Natural Gas Price Indexes

7.    Natural gas is a commodity typically transported in interstate commerce through a network of pipelines across the United States.  Mirant and Cinergy buy and sell natural gas for profit and their traders engage in transactions calling for the actual physical delivery of natural gas ("physical trades").

8.    Physical trades are typically priced with either a fixed price set at the time of the transaction or with reference to an index to be set at a later date.

9.    During the relevant period, natural gas traders and companies, including Atha, McDonald and Whalen, reported natural gas market information to companies that calculated natural gas price indexes ("indexes").  The indexes included *Inside FERC Gas Market Report* ("*IFERC*"), *Gas Daily*, and *Natural Gas Intelligence* ("*NGI*") (collectively, the "index publications").

10.    The reported market information included price and volume information for natural gas transactions entered into by market participants for delivery at a specific location or hub.

11.    Participants in the natural gas industry widely used these indexes to determine price and settlement of index trades, as well as to assess price risks.

12.     The price and volume information reported to those index publications, which used it to calculate price indexes, was market information that affects or tends to affect the price of natural gas, a commodity in interstate commerce.

**F.    Atha Regularly Falsely Reported and Attempted to Manipulate the Price of Natural Gas**

13.     During the relevant period, *IFERC* sent to Atha by electronic mail a monthly request for various categories of transaction information by electronic mail via the Internet.  Attached to the request was a spreadsheet seeking price, volume and other transaction information regarding Mirant's fixed-price baseload natural gas trades executed during bidweek.

14.     A baseload deal is a trade requiring the delivery of a specific quantity of natural gas on each day of the following month.  Bidweek refers to the last four to five trading days of each month.

14.     During the relevant period, Atha completed the spreadsheet each month and electronically delivered it, or caused it to be delivered, back to *IFERC*.  He did so as many as four times during each bidweek – usually once each day with daily cumulative additions.  On the last day of each bidweek, Atha also delivered, or caused to be delivered, the completed spreadsheet to *Gas Daily* and *NGI*.

15.     In preparing the spreadsheet to send to *IFERC*, Atha fabricated prices, volumes and trade dates based upon, among other things, price and volume information submitted to him by McDonald and other Mirant West Desk traders, and upon McDonald's instructions.

16.     The price and volume information used by Atha as provided to him by McDonald and others did not reflect his (Atha's) or any other Mirant trader's actual baseload deals negotiated during bidweek.

17.     Before Atha delivered, or caused to be delivered, the spreadsheet with the fabricated trades to the index publications, McDonald reviewed the spreadsheet and directed any changes that he wanted made.

18.     In preparing the spreadsheet, Atha ensured that the sum of the fabricated trades equaled the predetermined total volume and weighted average prices he and McDonald wanted to report.

19.     For many of the fabricated trades included in the spreadsheet, Atha and McDonald made up counterparties, falsely identifying companies as the purported counterparties to the transactions when in fact they were not.

20.     As a result of this scheme, Atha knowingly delivered, or caused to be delivered, to *IFERC*, *Gas Daily*, and *NGI* reports concerning hundreds of natural gas trades.  Most, if not all, of the submitted reports contained false or misleading

or knowingly inaccurate information in the form of a fabricated price, fabricated volume, fabricated counterparty, and/or fabricated delivery point.

21.    The false or misleading or knowingly inaccurate reports Atha delivered, or caused to be delivered, to *IFERC*, *Gas Daily*, and/or *NGI* contained market information that affects or tends to affect the price of natural gas, a commodity in interstate commerce, and Atha knowingly delivered, or caused to be delivered, those reports in an attempt to manipulate the price of natural gas, a commodity in interstate commerce.

22.    If the manipulation of the price of natural gas had been successful, it could have affected the price of natural gas, a commodity in interstate commerce, and the price of natural gas futures and options contracts traded on the New York Mercantile Exchange ("NYMEX").

**G.    Atha Falsely Reported and Attempted to Manipulate the Price of Natural Gas in July/August 2000**

23.    On July 27, 2000, in a series of recorded telephone calls, McDonald and Whalen determined that they both wanted the August *IFERC* index price of natural gas at the Permian delivery point to be low.  To achieve this, McDonald and Whalen planned, with the assistance of Atha, to report natural gas trades for the Permian delivery point at fabricated prices and/or volumes in an attempt to

ensure that the August *IFERC* Permian index price of natural gas was lower than it otherwise would have been.

24.     They agreed that each of the trades they reported would contain false volume, price and other transaction data, and would falsely identify Mirant and Cinergy as parties to the transactions.

25.     Later in the day on July 28, 2000, Whalen telephoned Atha to verify the list of fabricated trades that Atha, McDonald and Whalen would falsely report to *IFERC* as trades having been executed between Mirant and Cinergy; again to ensure that the prices and volumes they were going to report would be "believable" to *IFERC*.

26.     During the phone call, which was also recorded, Whalen asked Atha for guidance on how to structure the fictional trades they were going to report based on Atha's past experience in submitting false trades:

> [Whalen]:  [I]s it common for you guys to drop in a 50 a day on the same day at the same price with one counter party or is this a first?

Atha responded:

> [Atha]:  No.  That's why we're usually, 25 has kind of been our – unless it was a real trade – 25 has kind of been our max bullshit number.

27.     Atha prepared and electronically delivered, or caused to be delivered, to *IFERC* physical gas trade information on July 26, 27, 28, and 31, 2000.  The

report delivered on July 31, 2000, included the trades that Atha, McDonald and Whalen fabricated during the July 27 and 28 recorded telephone calls identified above. The same reports were electronically delivered by Atha to *NGI* and *Gas Daily*.

28.     Whalen also prepared and electronically delivered, or caused to be delivered, to *IFERC* a report that included the trades that Atha, McDonald and Whalen fabricated during the July 27 and 28 recorded telephone calls identified above.

29.     The totality of the evidence as set forth in paragraphs 23 through 29 above shows that Atha, McDonald and Whalen intended to manipulate the price of natural gas at the Permian delivery point, as well as multiple other delivery points.

30.     Atha knowingly delivered, or caused to be delivered, the false or misleading or knowingly inaccurate reports, intending for the indexes to use these reports to calculate the index prices of natural gas.

31.     If the attempted manipulation of the price of natural gas had been successful, it could have affected the price of natural gas, a commodity in interstate commerce, and the price of natural gas futures and options contracts traded on the NYMEX.

**H.    Atha Falsely Reported and Attempted to Manipulate the Price of Natural Gas in September/October 2000**

32.    On September 26, 2000, Atha delivered, or caused to be delivered, the first of three cumulative spreadsheets to *IFERC* reporting that Mirant allegedly had completed a transaction on September 25, 2000 with Enserco Energy, Inc. ("Enserco") at the Questar delivery point (the "fictitious Questar Transaction"). Atha's report included both price and volume information for the fictitious Questar Transaction.

33.    On October 2, 2000, a reporter from *IFERC* telephoned Atha to verify the fictitious Questar Transaction.  Realizing that he could not provide verification of the fictitious Questar Transaction, Atha placed the *IFERC* reporter on hold and contacted McDonald for assistance.  McDonald told Atha to falsely tell the *IFERC* reporter that the correct counterparty was Cinergy, and further advised Atha that he (McDonald) would telephone Whalen at Cinergy to confirm that Whalen would verify the trade to *IFERC*.

34.    Atha falsely told the *IFERC* reporter that the fictitious Questar Transaction was originally executed with Enserco, but that the deal was broken and re-executed with Cinergy.

35.    While Atha was telling that false story to the *IFERC* reporter, McDonald telephoned Whalen and in a recorded call, secured his (Whalen's) agreement to provide the same false information to the *IFERC* reporter.

36.    Later on October 2, 2000, the *IFERC* reporter telephoned Whalen at Cinergy to verify the fictitious Questar Transaction, and Whalen falsely told *IFERC* that he executed that transaction with Mirant.

37.    Atha knowingly delivered, or caused to be delivered, the false or misleading or knowingly inaccurate reports containing the fictitious Questar transaction, intending for *IFERC* to use these reports to calculate the index prices of natural gas.

38.    If the attempted manipulation of the price of natural gas had been successful, it could have affected the price of natural gas, a commodity in interstate commerce, and the price of natural gas futures and options contracts traded on the NYMEX.

## CONCLUSIONS OF LAW

39.    Section 6c of the Act authorizes the Commission to file a complaint for injunctive relief in the appropriate District Court "whenever it appears that . . . any person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision" of the Act.  7 U.S.C. § 13a-1(a).  The

plain language of the Act authorizes an injunctive action based solely upon past conduct.

40.     Sections 6(c) and 6(d) of the Act, 7 U.S.C. §§ 9 and 13b, together authorize the Commission to serve a complaint and provide for the imposition of, among other things, fines and penalties if the Commission "has reason to believe that any person . . . has manipulated or attempted to manipulate the market price of any commodity, in interstate commerce, or for future delivery on or subject to the rules of any contract market . . . or otherwise is violating or has violated any of the provisions of [the] Act."

### Atha Violated Section 9(a)(2) of the Act
### By Submitting False, Misleading or Knowingly Inaccurate Reports

41.     Section 9(a)(2) of the Act, 7 U.S.C. § 13(a)(2), makes it unlawful for any person to "[k]nowingly to deliver or cause to be delivered for transmission through the mails or interstate commerce by telegraph, telephone, wireless, or other means of communication false or misleading or knowingly inaccurate reports concerning crop or market information or conditions that affect or tend to affect the price of any commodity in interstate commerce[.]" *See United States v. Valencia,* 394 F.3d 352, 357 (5th Cir. 2004) (false reporting is actionable under Section 9(a)(2) of the Act, 7 U.S.C. § 13(a)(2)); *United States Commodity Futures Trading*

*Commission v. Johnson*, 408 F.Supp.2d 259 (S.D. Tex. 2005) (same); *United States Commodity Futures Trading Commission v. Bradley*, 408 F.Supp.2d 1214 (N.D. OK 2005) (same); *see also*, *United Egg Producers v. Bauer Int'l Corp.*, 311 F. Supp. 1375, 1383 (S.D.N.Y. 1970) (concluding that false press releases regarding egg importation "tended to affect the price of eggs in interstate commerce"); *In re Soybean Futures Litig.*, 892 F. Supp. 1025, 1046 (N.D. Ill. 1995) (concluding that false reports can influence prices and constitute part of a manipulation claim).

42.     By his conduct set forth above, Atha violated Section 9(a)(2) of the Act, 7 U.S.C. § 13(a)(2) when he knowingly delivered, or caused to be delivered, false or misleading or knowingly inaccurate reports concerning natural gas transactions, including fabricated trades, to the index publications.

43.     The false or misleading or knowingly inaccurate reports Atha delivered, or caused to be delivered, to the index publications contained market information that affects or tends to affect the price of natural gas, a commodity in interstate commerce.

## Atha Violated Section 9(a)(2) of the Act
## By Attempting to Manipulate the Price of Natural Gas

44.     Section 9(a)(2), 7 U.S.C. § 13(a)(2), makes it unlawful for any person "to manipulate or attempt to manipulate the price of any commodity in interstate commerce, or for future delivery[.]"

45.     The following elements are required to prove an attempted manipulation:  (i) an intent to affect the market price; and (ii) some overt act in furtherance of that intent. *See CFTC v. Atha,* 2006 WL 687728, at *6 (N.D. Ga. 2006) (citing *In re Hohenberg Bros. Co.,* [1975-1977 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 20,271 at 21,477 (CFTC Feb. 18, 1977)).  To prove the intent element of manipulation or attempted manipulation, it must be shown that the defendant "acted (or failed to act) with the purpose or conscious object of causing or effecting a price or price trend in the market that did not reflect the legitimate forces of supply and demand." *In re Indiana Farm Bureau Cooperative Association*, [1982-1984 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 21,796 at 27,281 (CFTC Dec. 17, 1982).  "[I]ntent is the essence of manipulation." *Id.* at 27,282.

46.     Atha specifically intended to manipulate the price of natural gas at multiple delivery points when he engaged in the overt act(s) of delivering, causing

to be delivered, and/or coordinating with McDonald and Whalen to deliver or cause to be delivered, through the mails or interstate commerce by telegraph, telephone, wireless, or other means of communication, false or misleading or knowingly inaccurate reports concerning natural gas transactions to the index publications.

47.     By his conduct set forth above, Atha violated Sections 6(c), 6(d), and 9(a)(2) of the Act, 7 U.S.C. §§ 9, 13b and 13(a)(2), when he attempted to manipulate the price of natural gas, a commodity in interstate commerce.

## By Aiding and Abetting the False Reporting and Attempted Manipulations of McDonald and Whalen, Atha Is Also Responsible for their Actions Pursuant to Section 13(a) of the Act

48.     Pursuant to Section 13(a) of the Act, 7 U.S.C. § 13c(a), "[a]ny person who commits, or who willfully aids, abets, counsels, . . . or procures the commission of a violation of this Act, . . . or who acts in combination or concert with any other person in any such violation, or who willfully causes an act to be done . . . may be held responsible for such violation as a principal."

49.     Based on the conduct set forth above, Atha willfully aided, abetted, counseled and worked in combination and concert with McDonald and Whalen in the scheme to deliver, or cause to be delivered, false or misleading or knowingly

inaccurate reports to index publications and 2) attempt to manipulate the price of natural gas, all in violation of Section 9(a)(2) of the Act, 7 U.S.C. § 13(a)(2).  Atha is therefore also responsible as a principle for McDonald's and Whalen's violations of the Act pursuant to Section 13(a) of the Act, 7 U.S.C. §13c(a).

## IV.   ORDER FOR PERMANENT INJUNCTION

With the consent of the Commission and Atha, **IT IS NOW HEREBY ORDERED THAT**:

1.      Atha is permanently restrained, enjoined and prohibited from directly or indirectly engaging in any conduct that violates Sections 6(c), 6(d), and 9(a)(2) of the Act, 7 U.S.C. §§ 9, 13b and 13(a)(2), including:

      a.      Providing any false, misleading or knowingly inaccurate reports concerning crop or market information or conditions that affect or tend to affect the price of any commodity in interstate commerce; and

      b.       Manipulating or attempting to manipulate the price of any commodity in interstate commerce or for future delivery on or subject to the rules of a registered entity.

2.      Atha is permanently restrained, enjoined and prohibited from applying for registration or engaging in any activity requiring such registration, or acting as

a principal (as defined by the National Futures Association Registration Rule 101) of any registered entity or person, or entity or person required to be registered.

3.      The injunctive provisions of this Order shall be binding on Atha, upon any person acting in the capacity of officer, agent, servant, or employee of Atha, and upon any person who receives actual notice of this Consent Order by personal service or otherwise insofar as he or she is acting in active concert or participation with Atha.

## V.    ORDER FOR CIVIL MONETARY PENALTY AND OTHER ANCILLARY RELIEF

With the consent of the Commission and Atha, **IT IS NOW HEREBY ORDERED** that Atha shall comply fully with the following terms, conditions and obligations relating to the payment of a civil monetary penalty.

1.      A civil monetary penalty in the amount of two hundred thousand dollars ($200,000) , plus post-judgment interest, is assessed against Atha, and is due and owing ten days from the date of this Order pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1.

2.      Post-judgment interest shall accrue beginning on the date payment is due and shall be determined by using the Treasury Bill rate prevailing on the date of the entry of this Order pursuant to 28 U.S.C. § 1961.

3.     Atha shall pay this civil monetary penalty by electronic funds transfer, U.S. postal money order, certified check, bank cashier's check, or bank money order.  If payment is to be made other than by electronic funds transfer, the payment shall be made payable to the Commodity Futures Trading Commission and sent to the address below:

> Commodity Futures Trading Commission
> Division of Enforcement
> Attn:  Marie Bateman – AMZ-300
> DOT/FAA/MMAC
> 6500 S. MacArthur Blvd.
> Oklahoma City, Oklahoma 73169
> Telephone: 405-954-6569

If payment is to be made by electronic funds transfer, Atha shall contact Marie Bateman or her successor at the above address to receive payment instructions and shall fully comply with those instructions.  Atha shall accompany payment of the penalty with a cover letter that identifies the paying Defendant and the name and docket number of the proceedings.  Atha shall simultaneously transmit copies of the cover letter and the form of payment to the Director, Division of Enforcement, Commodity Futures Trading Commission, Three Lafayette Centre, 1155 21st Street, N.W., Washington, D.C. 20581, and the Chief, Office of Cooperative Enforcement, at the same address.

## VI.   <u>MISCELLANEOUS PROVISIONS</u>

1.     <u>Notices.</u>  All notices required by this Order shall be sent by certified

mail, return receipt requested, as follows:

          a.     Notice to Plaintiff Commission:

                Division of Enforcement
                Commodity Futures Trading Commission
                1155 21st Street, NW
                Washington, DC 20581

          b.     Notice to Defendant Paul Atha:
                c/o Chris Flood, Esq.
                Flood & Flood
                Suite 800
                914 Preston at Main
                Houston, Texas 77002

2.     <u>Successors and Assigns.</u>  This Order shall inure to the benefit of and

be binding on the parties' successors, assigns, heirs, beneficiaries and

administrators.

3.     <u>Counterparts.</u>  This Order may be executed by the parties in

counterparts and by facsimile.

4.     <u>Entire Agreement, Amendments and Severability.</u>  This Order

incorporates all of the terms and conditions of the settlement among the parties.

Nothing shall serve to amend or modify this Order in any respect whatsoever,

unless: (1) reduced to writing, (2) signed by all parties, and (3) approved by order of the Court.

5.    Invalidation:  If any provision of this Order, or if the application of any provisions or circumstances is held invalid, the remainder of the Order and the application of the provisions to any other person or circumstance shall not be affected by the holding.

6.    Waiver:  The failure of any party hereto at any time or times to require performance of any provision hereof shall in no manner affect the right of such party at a later time to enforce the same or any other provision of this Order.  No waiver in one or more instances of the breach of any provision contained in this Order shall be deemed to be or construed as a further or continuing waiver of such breach or waiver of the breach of any other provision of this Order.

7.    Acknowledgements:  Atha understands and acknowledges that this Order must be accepted and ratified by the Commission before it becomes final. However, Atha understands and agrees that by his signature he is bound by the terms and conditions of this Order, unless the Commission refuses to accept and ratify the Order.

8.    Continuing Jurisdiction of this Court.  Upon entry of this Order, this case shall be dismissed with prejudice as to Atha, and the Court shall retain

jurisdiction of this cause to assure compliance with this Order and for all other purposes related to this action.

**WHEREFORE**, there being no just reason for delay, the Clerk of the Court is hereby directed to enter this Consent Order of Permanent Injunction and Other Relief Against Defendant Paul Atha.

Dated: __10|5__, 2007

Consented to and approved for entry by:

Chris Flood, Esq.
Flood & Flood
Suite 800
914 Preston at Main
Houston, Texas 77002
Counsel for Defendant

Dated: _____, 2007

John Taylor, Esq.
Corey, Taylor & Feil
The Lenox Building, Suite 1700
Peachtree Road, N.E.
Atlanta, GA 30326-1148
Local Counsel for Defendant

Dated: __10|5__, 2007

Paul Atha

Dated: _10 - 14_, 2007

Kathleen M. Banar, Esq.
(Admitted *pro hac vice*)
Anne M. Termine, Esq.
(Admitted *pro hac vice*)
Commodity Futures Trading Commission
Three Lafayette Centre
1155 21st Street, N.W.
Washington, DC 20581
Counsel for Plaintiff

Dated: _10-3_, 2007

Laura Bonander, Esq.
Assistant United States Attorney
600 U.S. Courthouse
75 Spring Street, S.W.
Atlanta, Georgia 30303
Local Counsel for Plaintiff

Ordered on this 7th day of November, 2007.

HON. J. Owen Forrester
UNITED STATES DISTRICT JUDGE